**CITY OF CARMEL, Indiana, Appellant–Respondent,**

v.

**CERTAIN HOME PLACE ANNEXATION TERRITORY LANDOWNERS, Appellees–Petitioners.**

No. 29A04–0510–CV–578.

Court of Appeals of Indiana.

Oct. 17, 2007.

Douglas C. Haney, City of Carmel Department of Law, Carmel, IN, George T. Patton, Jr., Bryan H. Babb, Bose McKinney & Evans, LLP, Nicholas K. Kile, Barnes & Thornburg, LLP, Indianapolis, IN, Attorneys for Appellant.

Stephen R. Buschmann, Thrasher Buschmann Griffith & Voelkel, P.C., Indianapolis, IN, Attorney for Appellees.

## OPINION

VAIDIK, Judge.

### Case Summary

In this case, Certain Home Place Annexation Territory Landowners ("the Remonstrators") successfully challenged an annexation attempt by the City of Carmel ("Carmel"). Carmel now appeals, complaining that the trial court improperly engaged in an audit of its fiscal plan when it found that Carmel failed to sufficiently and specifically set forth the methods of financing the planned services to be provided to Home Place following annexation. In light of the Indiana Supreme Court's recent opinion in *City of Carmel v. Certain Southwest Clay Township Annexation Territory Landowners*, 868 N.E.2d 793 (Ind.2007) ("*Southwest Clay*")—in which our Supreme Court reversed the trial court's order that Carmel may not annex territory in Southwest Clay—and Carmel's accountant's testimony supplementing the fiscal plan, we conclude that Carmel met its burden of proving the statutory prerequisite that the fiscal plan must show "[t]he method or methods of financing the planned services." The trial court's judgment to the contrary is akin to a judicial audit and constitutes clear error. We therefore reverse the trial court.

### Facts and Procedural History

On July 2, 2004, the Common Council of the City of Carmel ("the Council") introduced Ordinance No. C–264 and a supporting eighteen-page fiscal plan, which was prepared by Wabash Scientific, for the purpose of annexing territory in Hamilton County known as Home Place. *See* Def.'s Ex. B (resolution and fiscal plan). The general boundaries of the territory are 99th Street to the south, Pennsylvania Street to the west, 111th Street to the north, and Westfield Boulevard to the east. On November 15, 2004, the Council unani-

mously passed Ordinance No. C–264. *See* Appellant's App. p. 23–25.

The fiscal plan for the annexation of Home Place includes an attached fifteen-page fiscal analysis prepared by a Certified Public Accountant, Curtis Coonrod, who has prepared fiscal projections for Carmel for over ten years. *See* Def.'s Ex. J (fiscal analysis).[1] In sum, Mr. Coonrod's fiscal analysis indicates that Carmel's projected expenditures for planned services with regard to the Home Place annexation over the first three years following annexation will exceed Carmel's projected revenues by $986,743.00 for 2006; $975,250.00 for 2007; and $1,476,590.00 for 2008. *Id.* To cover this deficit, the fiscal analysis indicates that Carmel will utilize "Other available net revenue" in the amount of $986,743.00 for 2006; $975,250.00 for 2007; and $3,812,561.00 for 2008. *Id.* These projections result in projected excess resources available to Carmel of $0.00 in 2006 and 2007 and $2,335,971.00 in 2008. *Id.* Neither the fiscal plan nor the attached fiscal analysis indicates the source of the "Other available net revenue."

On February 18, 2005, the Remonstrators filed a Petition Remonstrating against the Proposed Annexation of Home Place into the City of Carmel. On May 10, 2005, the trial court certified the remonstrance, and a hearing was held on July 7–8, 2005.

█ On the first day of the hearing, Mr. Coonrod testified that although "the expenditures related to the annexation would be greater than the revenues," the costs of the planned services for the annexation would be funded from "other available net revenue."[2] Tr. p. 63. Mr. Coonrod explained:

As I said a couple of times we prepare a comprehensive analysis of all of Carmel's revenues and expenditures. That analysis, among other things, projects the available resources or what the accountants call fund balance that Carmel will have at the end of every year in the future. By ["]available["] I mean there is no committed use for that money so it can be appropriated by the council for any purpose. That amount is available to fund the Home Place annexation and the numbers you are seeing in that line represent the balance in that projection.

*Id.* at 63–64. Mr. Coonrod later emphasized that "the city would have adequate available resources to more than cover the difference." *Id.* at 67–68. On cross-examination, Mr. Coonrod agreed that the "other available net revenue," which he described as "those funds that have accrued over time that are available," could be considered as "Carmel's cash." *Id.* at 79.

Eric Reedy, CPA, testified as an expert witness on behalf of the Remonstrators regarding his review of Carmel's fiscal plan and other documents pertinent to Carmel's financial condition, including documents from the Department of Local Government Finance, the State Board of Accounts, and Carmel's most recent annual report as prepared by Carmel's Clerk–Treasurer. *Id.* at 103, 104. Mr. Reedy concluded that according to his review "of

---

1. The fiscal analysis, which was attached to the fiscal plan, was revised on July 22, 2004. In keeping with the references used by the trial court and the parties at both the underlying hearing and in this appeal, our references herein are to the original—and only—fiscal plan and to the revised fiscal analysis.

2. Where a fiscal plan lacks the specificity required to meet the requirements of Indiana Code § 36–4–3–13, a city may amend its plan to include adequate specificity on the issue via testimony presented at a remonstrance hearing. *Bradley v. City of New Castle*, 764 N.E.2d 212, 219 (Ind.2002); *see also Southwest Clay*, 868 N.E.2d at 796–97.

the city's fund report,"[3] Carmel did not have sufficient "other available net revenue" to fund the expenses of the annexation "in 2006 or any year subsequent to that." *Id.* at 107. On cross-examination, Mr. Reedy clarified that he did not disagree with Mr. Coonrod's conclusion that there are funds available to pay for the planned services; rather, he believed those funds would have to come from different sources, namely, "more increased property taxes" from both the "citizens of Home Place" and "the citizens of Carmel." *Id.* at 130, 131.

On the second day of the hearing, Mr. Coonrod testified in response to Mr. Reedy's opinion that Carmel did not have sufficient money to fund the Home Place annexation. Mr. Coonrod first disputed the reliability of the main report that Mr. Reedy relied upon in reaching his conclusion—the report from the Department of Local Government Finance. *See supra* note 3. Mr. Coonrod explained in great detail that in submitting these reports, there is an incentive—based on the budgetary process itself, politics, and human nature—for cities not to show an available balance: "the regulatory process is conservative and requires units to overestimate their expenditures and underestimate their revenues." Tr. p. 235. Mr. Coonrod testified that the more reliable place to look is "either the clerk/treasurer's records, the clerk/treasurer's annual report[.]" *Id.*

Mr. Coonrod then explained why Carmel's available balance, as reflected by the Clerk–Treasurer's 2004 annual report, was so low:

> [Although the 2004 annual report shows an available balance of only 2.5 million dollars,] [i]f Mr. Re[e]dy had looked at

earlier years he would have seen that Carmel's available balance in a normal year is more like 5 or 6 million dollars. And of course my projection is that that's about where it will be in a few years making the funds available to finance Home Place. How do I know that? Why was it so low in 2004 and how do I know that it's going to be more in the future? Well as, as I have testified, Mr. Buschmann has referred to and Mr. Re[e]dy, the odd way the income tax is distributed when annexations take place, bear in mind Carmel has just completed two successful, very large successive annexations. Clay Northwest and Clay West. The cost of serving those areas start immediately. The income tax comes in a little bit later and the property tax comes in the first year, then the income tax comes in in the second year. So Carmel's had two years where it's had increased costs but a lag in it's income tax revenue. And Carmel did exactly what Carmel proposes to do with Home Place although Home Place is much smaller. Carmel drew down it's [sic] available balance to fund its budgets through these difficult years. Now Carmel is beginning to receive that income tax and can build those balances back up so that's why I am able to project an adequate cash balance even though in the one year of 2004 the cash balance was somewhat less than what we projected would be needed to fund Home Place.

*Id.* at 235–36. On cross-examination, Mr. Coonrod clarified:

> I, from the beginning my testimony has been that if, if you just look at the impact of Home Place, the expenditures

---

**3.** This appears to be a reference to the report from the Department of Local Government Finance and not to the report prepared by Carmel's Clerk–Treasurer. As explained below, Mr. Coonrod testified that the report prepared by the Clerk–Treasurer is the more reliable place to look to determine whether Carmel has an operating balance.

will exceed the revenue. If you look at the full fiscal structure of Carmel, no I do not believe and never said that there would be a deficit in that in the future.

*Id.* at 253.

On October 4, 2005, the trial court issued Findings of Fact, Conclusions of Law, and Judgment Granting Petition Remonstrating Against the Proposed Annexation of Home Place into the City of Carmel, which focused on Mr. Reedy's testimony disputing the existence of Carmel's "Other available net revenue" alleged in the fiscal analysis. The trial court entered the following Findings of Fact with regard to the testimony presented at the hearing:

> 11. At the hearing, Mr. Coonrod testified that the asserted "other available net revenue[ ]" are "funds that have accrued over time and are available," agreeing with the [Remonstrators'] counsel that the asserted "other available net revenue[ ]" are "Carmel's cash."

> 12. In his rebuttal testimony against the financial analysis of the [Remonstrators'] expert witness, Eric Reedy, Mr. Coonrod observed that, in his opinion, "the least reliable place to look for the available balance of any unit is that formal budget document [filed by Carmel with the Indiana Department of Local Government Finance, and primarily relied upon by Mr. Reedy in forming his opinion that Carmel has no available cash to pay for the proposed annexation].["] "The more reliable place to look," Mr. Coonrod continued, is "the Clerk–Treasurer's records, the Clerk–Treasurer's annual report...." Mr. Coonrod testified further that the City of Carmel is already in a period of "drawing down its operating budget."

> 13. At the hearing, Carmel introduced no documents to prove the existence of the "other available net revenue[ ]" as asserted in Respondent's

Exhibit J and as reiterated, just as unreviewably, in the testimony of Mr. Coonrod.

> \*     \*     \*     \*     \*     \*

> 15. The evidence contains a direct conflict on the key question of whether Carmel indeed does have the "other available net revenue[ ]" asserted in Respondent's Exhibit J and described as "Carmel's cash" during Mr. Coonrod's testimony. Mr. Reedy testified for the [Remonstrators] that he saw no available operating balance for the City of Carmel "in 2006 or any year subsequent to 2006." He based his opinion not only on the formal report that Carmel filed with the Indiana Department of Local Government Finance but also on "the most recent annual report of the City of Carmel," the kind of document that Mr. Coonrod himself called "the more reliable place to look" for Carmel's available operating balance.

> 16. Both on its own terms and in the context of other pertinent evidence, the City's evidence that it will pay for the proposed annexation with "other available net revenue[ ]" is merely a "vague promise" that fails to "show ... the method or methods of financing" the annexation as required by I.C. s 36–4–3–13(d)(2). Carmel's fiscal plan therefore does not "represent[ ] a *credible* commitment by the municipality to provide the annexed area with comparable capital and non-capital services." *Bradley v. City of New Castle*, 764 N.E.2d 212, 216 (Ind.2002) (emphasis added).

Appellant's App. p. 11–12 (Order of Oct. 4, 2005).

As such, the trial court concluded:

> 7. The [Remonstrators'] remonstrance petition here should be granted because Carmel has not met its burden of proving a fiscal plan that complies

with I.C. 36–4–3–13(d)(2) and thus "represents a *credible* commitment ... to provide the annexed area with comparable capital and non-capital services." *Bradley,* 764 N.E.2d at 216 (emphasis added). Even under the more deferential judicial review that applied under earlier annexation statutes, *see, e.g., id.,* Carmel's "vague promises" about the asserted "other available net revenue[ ]" with which it would pay for annexing Home Place cannot support a judgment for Carmel.

By themselves, Mr. Coonrod's undocumented assertions about the existence of "other available net revenue[ ]" merely repeat the "vague promises" in Respondent's Exhibit J of those alleged "revenues," and thus neither Respondent's Exhibit J nor Mr. Coonrod's testimony nor a combination of Respondent's Exhibit J and Mr. Coonrod's testimony can support a judgment for Carmel; conflicts or inconsistencies between Mr. Coonrod's oral testimony and other evidence, though, further undermine Carmel's credibility on this essential part of its case. One inconsistency lies between the language of Respondent's Exhibit J and Mr. Coonrod's testimony: whereas Respondent's Exhibit J speaks of "other available net revenue[ ]," Mr. Coonrod spoke of a supply of "cash" that is already at Carmel's disposal. Even for public entities, however, "revenues" refers to incoming new funds, *see* BLACK'S LAW DICTIONARY (6th ed.) at 1319 (defining "public revenues"), not to a currently available, static supply of "cash." Further, Mr. Coonrod himself raised questions about Carmel's current operating balance by stating, in rebuttal, that Carmel has been "drawing down its operating balance." Most telling of all, Mr. Reedy's assessment of Carmel's operating balance—that the City has no operating balance at all—directly conflicts with Mr. Coonrod's assurance that the cash is there—and Mr. Reedy based his assessment in part on what Mr. Coonrod himself called "the more reliable place to look" for Carmel's available balance, the Clerk–Treasurer's annual report for the City. Carmel could have called any of a number of sworn public officials, especially the City's Clerk–Treasurer, to testify in behalf of the proposed annexation; perhaps the simplest, most persuasive solution of all would have been to introduce a certified copy of the City's financial records to prove that the asserted "other available net revenues" do indeed exist. Instead of these ready alternatives, though, the City's evidence requires the Court to accept the undocumented assertions of Carmel's third-party accountant that the funds are available. Accordingly, the Court can only conclude that Carmel has not sustained its burden of proving a fiscal plan that satisfies I.C. s 36–4–3–13(d)(2) and thus "represents a *credible* commitment ... to provide the annexed area with comparable capital and non-capital services." *Bradley,* 764 N.E.2d at 216 (emphasis added). The [Remonstrators'] petition therefore should be granted.

*Id.* at 16–17. Carmel then appealed to this Court.

Originally, this case was set for oral argument in September 2006. However, in August 2006, the Indiana Supreme Court accepted jurisdiction over *Southwest Clay* pursuant to Indiana Appellate Rule 56(A), thereby permitting a direct appeal. Because of the possible impact of *Southwest Clay* on this case, on September 25, 2006, we issued an order vacating the oral argument and staying this case pending the Supreme Court's opinion in *Southwest Clay.* On June 27, 2007, the Indiana Supreme Court issued its decision in *South-*

*west Clay.* Following our Supreme Court's opinion in *Southwest Clay,* Carmel filed a motion to lift the stay in this case, which we granted, and the parties submitted additional arguments to this Court regarding the impact of *Southwest Clay* on this matter. Oral argument was held on September 18, 2007.[4]

### Discussion and Decision

■ Carmel contends that the trial court improperly engaged in an audit of its fiscal plan when it found that Carmel failed to sufficiently and specifically set forth the methods of financing the planned services to be provided to Home Place following annexation, which Indiana Code § 36–4–3–13(d)(2) requires.[5] "Annexation is subject to judicial review only so far as the General Assembly has authorized it by statute, and [t]he larger object of the annexation statute is, as it has always been, to permit annexation of adjacent urban territory." *Southwest Clay,* 868 N.E.2d at 797 (quotation omitted). Our review of the trial court's special findings is limited to reviewing the sufficiency of the evidence for issues of fact and then looking to the

record for evidence favorable to judgment. *Id.* We do not set aside findings or judgments unless they are clearly erroneous, but we review questions of law *de novo.* *Id.*

■ Indiana adopted its first annexation statute in 1824, which allowed for "virtually automatic annexation of new developments adjacent to existing municipalities." *Id.* at 796. Although Indiana's annexation laws have evolved over time, the object of annexation has remained the same: "to permit annexation of adjacent urban property." *Id.* (quotation omitted). The statutory framework has also retained the same three stages: (1) legislative adoption of an ordinance that annexes certain territory and pledges to deliver certain services within a fixed period of time; (2) an opportunity for affected landowners to file a remonstrance; and (3) judicial review. *Id.*

■ "When a remonstrance is certified, the trial court must conduct a hearing and determine whether the annexation may go forward 'according to the evidence that either party may introduce.'" *Id.* (quoting

4. We commend counsel for their presentations at oral argument, which aided in our resolution of this case.

5. Although Carmel divides this issue into two separate issues in its brief, we treat it as one issue. In addition, Carmel makes an argument with regard to the following portion of the trial court's Conclusion 7 as recited above:

> Carmel could have called any of a number of sworn public officials, especially the City's Clerk–Treasurer, to testify in behalf of the proposed annexation; perhaps the simplest, most persuasive solution of all would have been to introduce a certified copy of the City's financial records to prove that the asserted "other available net revenues" do indeed exist.

Appellant's App. p. 17. Carmel argues that this language can reasonably be interpreted as an attempt by this trial court to write a

heretofore unsupported requirement into Indiana Code § 36–4–3–13(d)(2) that a city seeking annexation must present the testimony of a municipal officer or a certified copy of municipal financial records to demonstrate how it plans to meet the requirements of the statute. *See* Appellant's Br. p. 18–21. We agree with the Remonstrators here that Carmel's interpretation of the trial court's language falls well short of a reasonable reading of that language. The trial court here is merely indicating that although Carmel had the burden of proof on this issue and although it could have presented further evidence to meet this burden—*such as* the testimony of its municipal officers or its financial records—it chose to rely on the testimony of its accountant, which the trial court concluded was not enough. This in no way indicates that a city cannot rely solely on its accountant or that it is required to rely on its officers or its financial records. We dismiss Carmel's argument to this effect.

Ind.Code § 36–4–3–12(a)). The city bears the burden of showing that it has complied with the statutory conditions for annexation. *Id.* Indiana Code § 36–4–3–13 lists the prerequisites for annexation. Except as provided in subsections (e) and (g), the court shall order a proposed annexation to take place if the city meets the requirements of subsections (b) or (c) and subsection (d). Ind.Code § 36–4–3–13(a).

First, an annexing city must satisfy either subsection (b) or (c), both of which reflect the legislature's desire for some contiguity between the city and the annexation territory. *Southwest Clay*, 868 N.E.2d at 798. In addition to contiguity, subsection (b) requires one of three conditions to exist relating to the extent the territory is in use. I.C. § 36–4–3–13(b). Those conditions are:

(A) The resident population density of the territory sought to be annexed is at least three (3) persons per acre.

(B) Sixty percent (60%) of the territory is subdivided.

(C) The territory is zoned for commercial, business, or industrial uses.

*Id.* Pursuant to subsection (c), the city must show that at least one-fourth of the aggregate external boundaries of the annexation territory coincide with the city's boundaries. I.C. § 36–4–3–13(c). The city must also demonstrate that "the territory sought to be annexed is needed and can be used by the municipality for its development in the reasonably near future." *Id.* Here, the parties stipulated that Carmel's proposed annexation satisfied subsection (b). We therefore turn to the next prerequisite, subsection (d).

A city meets its burden under subsection (d) when the evidence "establishes that [it] has developed and adopted a written fiscal plan and has established a definite policy, by resolution of the legislative body[.]" I.C. § 36–4–3–13(d). The fiscal plan must show:

(1) The cost estimates of planned services to be furnished to the territory to be annexed. The plan must present itemized estimated costs for each municipal department or agency.

(2) The method or methods of financing the planned services. The plan must explain how specific and detailed expenses will be funded and must indicate the taxes, grants, and other funding to be used.

(3) The plan for the organization and extension of services. The plan must detail the specific services that will be provided and the dates the services will begin.

(4) That planned services of a noncapital nature, including police protection, fire protection, street and road maintenance, and other noncapital services normally provided within the corporate boundaries, will be provided to the annexed territory within one (1) year after the effective date of annexation and that they will be provided in a manner equivalent in standard and scope to those noncapital services provided to areas within the corporate boundaries regardless of similar topography, patterns of land use, and population density.

(5) That services of a capital improvement nature, including street construction, street lighting, sewer facilities, water facilities, and stormwater drainage facilities, will be provided to the annexed territory within three (3) years after the effective date of the annexation in the same manner as those services are provided to areas within the corporate boundaries, regardless of similar topography, patterns of land use, and population density, and in a manner consistent

with federal, state, and local laws, procedures, and planning criteria.

*Id.*

█ The requirement of a written fiscal plan serves three purposes in annexation law:

First, the publication of a written plan permits landowners to make an intelligent decision about whether to accept annexation or remonstrate. Second, requiring a written plan makes the opportunity for remonstrance and judicial review more realistic. As a practical matter, more than vague promises are needed for a court to test a city's ability to provide like services to the annexed territory. Third, a fiscal plan needs to be in writing to protect the right of landowners to institute proceedings to force an annexing city to provide the services promised under the plan.

*Southwest Clay,* 868 N.E.2d at 798 (citations omitted). "In assessing a municipality's ordinance and plan, a court should keep in mind that annexation is a legislative function." *Id.* (quotation omitted). "Moreover, a trial court hearing a remonstrance is not an examiner conducting an audit of a challenged fiscal plan. Rather, it should focus on whether that plan represents a credible commitment by the municipality to provide the annexed area with comparable capital and non-capital services." *Id.* at 798–99 (quotation omitted). In other words, trial courts play a "limited role" in annexations. *City of Ft. Wayne v. Certain Sw. Annexation Area Landowners,* 764 N.E.2d 221, 224 (Ind.2002).

In *Southwest Clay,* the trial court concluded that Carmel's fiscal plan failed to meet the requirements of subsection (d)(2). 868 N.E.2d at 799. Specifically, the trial court "criticized the plan for not providing the funding methods for services from each of Carmel's city departments or more specific estimates of expenses." *Id.* On appeal, our Supreme Court found that this conclusion was not supported by the evidence:

The plan's fiscal projections contain both a breakdown of expenditures by department and a description of which city funds will be used to pay for the overall package of services. The projections show the various forms of revenue expected to be collected in connection with the proposed annexation. They net out expenses and revenue to show the overall impact, demonstrating that revenue from the annexation territory will be a significant source of funding for services to the territory.

*Id.* (footnote omitted). After concluding that Carmel's fiscal plan "satisf[ied] the general purposes assigned to them under the Code," the Court stated:

The general question is whether services similar to those offered in the existing city will be provided and whether the annexing municipality will be able to finance them. The trial court noted that "Carmel did demonstrate the general financial wherewithal to pay for the SW Clay annexation." In light of the failure of the landowners to contest the adequacy of the services planned and the trial court's finding that the city's finances were sufficient to carry them out, the trial court's judgment that the plan did not meet the requirements of subsection [ (d)(2) ] was clear error.

*Id.* at 799–800 (record citation omitted); *see also City of Crown Point v. Fetcko,* 874 N.E.2d 644, 648 (Ind.Ct.App.2007) ("Following our supreme court's guidance in City of Carmel, we conclude that the plan is sufficiently specific regarding funding sources to satisfy the requirements of Indiana Code Section 36–4–3–13(d)(2) and that the trial court's conclusion to the contrary is clearly erroneous.").

Here, the trial court also concluded that Carmel's fiscal plan failed to meet the requirements of subsection (d)(2). As detailed above, the court believed that Carmel failed to prove the existence of "Other available net revenue" to fund the Home Place annexation. It is true that Mr. Coonrod's fiscal analysis shows that Carmel's projected expenditures for planned services with regard to the Home Place annexation over the first three years following annexation will exceed Carmel's projected revenues. However, the fiscal analysis goes on to show that Carmel will utilize "Other available net revenue" to cover this deficit. Although the fiscal analysis does not show the source of the "Other available net revenue," Mr. Coonrod expounded on this at the hearing. Specifically, he testified that Carmel had sufficient money in its operating balance—money that was not earmarked for anything specific—that could be used to cover the initial deficit that oftentimes results from annexation. Despite Mr. Reedy's testimony that the report filed with the Department of Local Government Finance did not show that Carmel had an operating balance, Mr. Coonrod thoroughly disputed that report's reliability and explained that according to the more reliable document—the annual report prepared by Carmel's Clerk–Treasurer—Carmel indeed had an operating balance. Mr. Coonrod went on to explain that because Carmel just completed two successive and very large annexations, its operating balance was lower than in previous years. Nevertheless, Mr. Coonrod predicted that as the income and property taxes started to flow in from those annexations, Carmel's operating balance would increase, and consequently, there would be more than enough money to fund the Home Place annexation.

In their most recent filings with this Court, *see* Appellant's Motion to Lift Stay, Response to Appellant's Motion to Lift Stay, and Appellant's Reply in Support of Motion to Lift Stay, the parties argue about the impact of *Southwest Clay* on this case. However, it is difficult to compare the facts in *Southwest Clay* to the facts in this case. This is because there is no indication in our Supreme Court's opinion whether the projected expenditures exceeded the projected revenues and, if so, how the deficit was specifically to be covered. Our Supreme Court did say, though, that the fiscal projections in that case "net out expenses and revenue to show the overall impact, demonstrating that revenue from the annexation territory will be a significant source of funding for services to the territory." *Southwest Clay*, 868 N.E.2d at 799.

Despite the difficulties in comparing the facts in *Southwest Clay* to the facts in this case, we conclude that, like the Southwest Clay fiscal plan, the fiscal plan here satisfies all three purposes assigned to it. As for giving notice so that those affected can make a decision about their interests, the Remonstrators stand before us in this proceeding as proof that the first purpose has been fulfilled. *See id.* As for the second, Carmel's fiscal plan explains in considerable detail its strategy for providing services to Home Place. *See id.* The level of detail is both ample for judicial review and sufficient to test Carmel's future fulfillment of the services promised under the plan. *See id.* For example, Carmel plans to hire at least two new communications center employees (at $48,000 each), six to seven new police officers (at $90,000 to $100,000 each), and three new street department employees ($154,863 total). Remonstrators do not challenge any of these calculations on appeal.

Our Supreme Court has made clear that "courts reviewing annexation challenges should focus on whether the municipality

made credible and enforceable commitments to provide equivalent services to similar areas. Courts are not authorized to dissect the minutiae of what are essentially legislative decisions." *City of Ft. Wayne,* 764 N.E.2d at 229; *see also Bradley v. City of New Castle,* 764 N.E.2d 212, 214 (Ind.2002) ("Annexation is essentially a legislative process, and courts should not micromanage it."). Although Mr. Reedy— who did not request any documents from Carmel, interview any Carmel officials, or audit Carmel's books, *see* Tr. p. 127— disputed Carmel's ability to finance the services, Mr. Coonrod testified that Carmel had more than enough money in its operating balance, which he labeled "Other available net revenue" in the fiscal analysis, to cover the initial deficits related to the annexation of Home Place. At the end of the day, it is apparent that Carmel has made credible and enforceable commitments to provide equivalent services to Home Place. In light of *Southwest Clay* and Mr. Coonrod's testimony supplementing the fiscal plan, the trial court's judgment that the fiscal plan did not meet the requirements of subsection (d)(2)—which requires the fiscal plan to show "[t]he method or methods of financing the planned services"—is akin to a judicial audit and constitutes clear error.

Reversed.

BARNES, J., and RILEY, J., concur.