CITY OF FORT WAYNE, Appellant (Respondent Below),

v.

CERTAIN SOUTHWEST ANNEXATION AREA LANDOWNERS, Appellees (Petitioners Below).

No. 02S05–0109–CV–412.

Supreme Court of Indiana.

March 12, 2002.

Mark E. GiaQuinta, Robert W. Eherenman, Haller & Colvin, P.C., J. Timothy McCaulay, Helmke, Beams, Boyer & Wagner, Fort Wayne, IN, for Appellant.

Edward L. Murphy, Jr., Larry L. Barnard, Miller Carson Boxberger & Murphy LLP, Fort Wayne, IN, for Appellee.

D. Randall Brown, Barnes & Thornburg, Fort Wayne, IN, for Amicus Curiae Indiana Association of Cities and Towns.

SHEPARD, Chief Justice.

In 1996, the City of Fort Wayne annexed nearly thirteen square miles with a population of 22,500 residents, postponing the effective date to 2006. Remonstrators contested the annexation. The trial court found the Fiscal Plan for annexation legally deficient for several reasons, largely because it predicted the costs of services in 2006 by calculating current costs and adding inflation. This was in effect a "judicial audit" of a decision that is legislative in nature. We reverse.

### Facts and Procedural History

On December 3, 1996, the Common Council of Fort Wayne passed Annexation Ordinance X–03–96 and approved a Fiscal Plan for annexation as required by Ind. Code Ann. § 36–4–3–13(d)(West Supp. 1996) ("Section 13(d)"). The Mayor of Fort Wayne signed the Ordinance into law on December 5, 1996. The Ordinance deferred the effective date of annexation to January 1, 2006, as Ind.Code Ann. § 36–4–3–8(1)(West 1997)("Section 8(1)") allowed.[1]

On February 4, 1997, Remonstrators challenged the annexation, claiming that the Fiscal Plan was legally insufficient. On January 11, 2000, the trial court issued its Findings of Fact, Conclusions of Law,

---

1. In 1999, the General Assembly amended this provision. Ind.Code Ann. § 36–4–3–8(b)(1)(West Supp.2000). Now, municipalities may only postpone annexations for up to three years as a general rule. *Id.* This significantly reduces many of the difficulties this case presents.

and Judgment in favor of the Remonstrators. The City appealed, arguing that there was insufficient evidence to support the trial court's conclusions that:

1. the City's Plan was deficient in calculating cost estimates for the planned services to be provided to the annexed area;

2. the City failed to provide in its Plan that it would deliver noncapital and capital improvement services to the annexation territory within the statutorily fixed periods of time;

3. the City improperly used a City-wide standard in comparing services to be provided to the annexation area to services currently provided within the City; and

4. the City was required by statute to provide a neighborhood park in the annexation area similar to a neighborhood park located in the comparable area of the City.

(*See* Appellant's Br. at 5–9.) The Court of Appeals affirmed, finding the first issue dispositive. *In re Ordinance No. X–03–96,* 744 N.E.2d 996, 1003 (Ind.Ct.App.2001). We granted transfer, vacating that opinion. 761 N.E.2d 412 (Ind.2001).

## I. Standard of Review for Annexation Challenges

■ *A. The Trial Court's Role.* We recited the limited role courts play in annexations in today's decision in *Bradley v. City of New Castle,* 764 N.E.2d 212 (Ind. 2002). Annexation is essentially a legislative function. *Rogers v. Mun. City of Elkhart,* 688 N.E.2d 1238 (Ind.1997).

Indiana Code §§ 36–4–3–11 through 13 establish requirements for remon-

strances;[2] give trial courts authority to hear and enter judgment on remonstrances;[3] and direct courts to order annexation provided that the city meets specified requirements on matters such as contiguity and has adopted a fiscal plan showing that it will provide municipal services to the annexed area that are equivalent to those enjoyed by residents in similar areas of the municipality.[4]

■ Although the municipality bears the burden of proof when properly challenged, we afford the municipality's legislative judgment substantial deference. Therefore, a trial court should not "audit" a challenged fiscal plan. Rather, it should focus on whether that plan represents a credible commitment by the municipality to provide the annexed area with equivalent capital and non-capital services.

■ *B. The Appellate Court's Role.* When a trial court enters special findings, as is the case here, we review issues of fact for sufficiency of the evidence and look to the record only for evidence favorable to the judgment. Ind. Trial Rule 52; *Rogers,* 688 N.E.2d at 1240. We do not set aside findings and judgments unless they are clearly erroneous. T.R. 52. We review questions of law *de novo. Rogers,* 688 N.E.2d at 1240.

## II. What the Statute Requires

At the time the City passed the Ordinance, Section 13(d) required annexing municipalities to develop written fiscal plans and establish definite policies, by contemporaneous legislative resolutions, to include the following:

---

2. Ind.Code Ann. § 36–4–3–11 (West Supp. 1992).

3. Ind.Code Ann. § 36–4–3–12 (West 1992).

4. Section 13; *Chidester v. City of Hobart,* 631 N.E.2d 908, 910 (Ind.1994)(*"Chidester II "*).

(1) The cost estimates of planned services to be furnished to the territory to be annexed.

. . . .

(4) That planned services of a noncapital nature, including police protection, fire protection, street and road maintenance, and other noncapital services normally provided within the corporate boundaries, will be provided to the annexed territory within one (1) year after the effective date of annexation, and that they will be provided in a manner equivalent in standard and scope to those noncapital services provided to areas within the corporate boundaries that have similar topography, patterns of land use, and population density.

(5) That services of a capital improvement nature, including street construction, street lighting, sewer facilities, water facilities, and stormwater drainage facilities, will be provided to the annexed territory within three (3) years after the effective date of the annexation, in the same manner as those services are provided to areas within the corporate boundaries that have similar topography, patterns of land use, and population density, and in a manner consistent with federal, state, and local laws, procedures and planning criteria.

Ind.Code Ann. § 36–4–3–13(d)(West Supp. 1996).

In *Bradley v. City of New Castle,* slip op. at 12, 764 N.E.2d at 227, we observed that Section 13 is a pretty straightforward directive: a court shall order annexation if a municipality satisfies Section 13's requirements. The question we address in this case is whether the trial court examined this Plan under too powerful a microscope.

## III.  A Credible Plan

**█  A.  *Why Require Fiscal Plans?*** In *City of Hobart v. Chidester,* 596 N.E.2d 1374 (Ind.1992) (*"Chidester I"*), we outlined the three purposes of fiscal plans. First, "the publication of a written plan permits landowners to make an intelligent decision about whether to accept annexation or remonstrate." *Id.* at 1377–78. Here, this purpose of the Plan was plainly met because more than an adequate number of citizens in the annexation area raised a timely challenge.

Second, "requiring a written plan makes the opportunity for remonstrance and judicial review more realistic. As a practical matter, more than vague promises are needed for a court to test a city's ability to provide like services to the annexed territory." *Id.* at 1378. Here, the trial court's extensive findings and conclusions again make clear that this Plan allowed for thorough review.

Third, "a fiscal plan needs to be in writing to protect the right of landowners to institute proceedings to force an annexing city to provide the services promised under the plan." *Chidester I,* 596 N.E.2d at 1378. Our analysis of each of the City's contentions will focus on whether the Plan fulfills this third purpose.

**█  B.  *Must Cities Forecast the Future?*** The trial court held that Section 13(d) requires annexing municipalities to project cost estimates forward to the effective annexation date. (R. at 532.) The Court of Appeals agreed, saying "we believe that cost estimates for noncapital services must be figured from one year after the effective date of annexation and for capital improvement services, three years after the effective date of annexation." *In re Ordinance No. X–03–96,* 744 N.E.2d at 1002.

We think the statute is not so prescriptive as that. Section 13(d) does not speak in terms of projections, forecasts, or inflated costs; it merely requires cost estimates. These cost estimates are not, as the Court of Appeals said, "irrelevant and arbitrary" if they are stated in current dollars. *Id.* at 1003. They are the means by which the municipality demonstrates its financial capacity to provide the services described in Sections 13(d)(4) and (5) at the time it authorizes an annexation.[5]

Here, the City undisputedly provided cost estimates. The trial court found, "The written annexation Fiscal Plan for the Southwest Extended Annexation Territory ... showed: .... B) Cost[ ] estimates of planned services to be furnished; ...." (R. at 510.)

Nonetheless, the trial court found the estimates legally deficient because they reflected the status quo at the time the Ordinance was passed, inflated at an estimated rate of three percent annually.[6] (R. at 532–34.) The essence of the trial court's rationale was: Section 13(d) speaks of services *to be* provided, so fiscal plans must forecast each individual service and its related costs. Projecting such services and costs ten or more years in advance is, as various City officials admitted, extremely difficult or impossible with any degree of accuracy. Therefore, the trial court reasoned, this annexation fails.

The trial court's reasoning creates an implicit limitation on annexation deferral periods. This runs counter to Section 8(1), which in 1996 explicitly allowed unlimited deferral. We will not read Section 13 in a way that effectively eliminates an option that Section 8(1) offered at the time the City passed the Ordinance.

We conclude that Section 13 does not require more than credible calculation of present costs of individual services adjusted forward to account for inflation. Based upon the finding of fact that the Plan did contain cost estimates of planned services to be furnished, the Plan passed legal muster in this respect.

*C.  A Commitment to Deliver.* Although the trial court held against the City on grounds of inadequate forward cost projections, it entered findings of fact covering most of the services listed in Sections 13(d)(4)-(5), plus some that were not listed. As to police service, the court found:

> 67) Upon the effective date of the annexation, the City will add ten (10) additional police officers to provide a coverage of two (2) police patrol officers per shift in the Annexation Territory. The City will also add one (1) police detective and one (1) police supervisor. The anticipated calls for service in the Annexation Territory would be six thousand seven hundred ten (6,710) runs per year requiring approximately five thousand (5,000) police hours. The "call for service" is the common element that drives police staffing.

---

**5.** We recognize that these costs will change over time. Citizens of the annexed areas may still enforce their rights because Sections 13(d)(4)-(5) require absolute promises that the annexed area will receive comparable capital and non-capital service, without regard to cost. Furthermore, Ind.Code Ann. § 36–4–3–16(b)(West 2001) provides relief if a municipality fails to implement a Section 13 fiscal plan on a timely basis *or* if "the annexed territory is not receiving governmental and proprietary services substantially equivalent in standard and scope to the services provided by the municipality to other areas of the municipality, regardless of topography, patterns of land use, and population density similar to the annexed territory."

**6.** Remonstrators presented expert testimony that two tables in the Plan didn't "add up" at three percent inflation. (R. at 521–22.)

(R. at 519.) As to fire protection, the court said:

17) There are three (3) new fire stations that will be constructed to serve the Southwest Extended annexation territory located at:

a) Getz Road and Constitution Drive

b) Scott and Covington Road

c) Liberty Mills and Ellison Road

18) The projected response times from these three (3) new fire stations that will serve the Southwest Extended annexation territory are within the same range as the average response times in the Comparable area.

(R. at 510–11.) The court discussed street and road maintenance at some length, and found:

52) The City Street Department provides a surface maintenance service which includes anything from patching a pothole to putting an overlay on a street in all areas of the City, and, upon annexation, will provide the same surface maintenance service to the Annexation Territory.

53) The City plans to provide immediately upon annexation general street maintenance by incorporating the Annexation Territory's nineteen and ninety-four hundredths (19.94) miles of arterial and collector streets and ninety-four and seventy-nine hundredths (94.79) miles of residential streets into the City's street maintenance program, which level of service is standard for the City.

(R. at 516.)[7] As to water and sewer facilities:

60) The City's Water Utility presently serves a portion of the Annexation Territory. Presently, a privately owned public utility provides water for human consumption to the balance of the Annexation Territory not presently served by the City's Water Utility.

61) Upon annexation, residents of the Annexation Territory who utilize the services of the City's Water Utility will pay the same in-city rate as those residents of the Comparable Area would pay.

62) In 1996, a portion of the Comparable Area was served by the same privately owned public water utility that services a portion of the Annexation Territory. Upon annexation, residents of the Annexation Territory not currently served by the City's Water Utility will be permitted to petition the City's Board of Public Works for water service extension which is the same process and procedure presently available to residents of the Comparable Area who are not presently served by the City's Water Utility.

63) There are some areas of the Annexation Territory currently served by the City's Sewer Utility. Upon annexation, the residents of the Annexation Territory served by the City's Sewer Utility would pay the same rate as would be charged customers of the City's Sewer Utility located in the Comparable Area.

64) Other portions of the Annexation Territory are served by ... a privately owned public utility ... [having] a certificate of territorial authority ("CTA") which grants exclusive jurisdiction, under Indiana law, to provide sanitary sewer service. The City is not authorized, or permitted, by Indiana law, to

---

7. The court also found that the City would provide comparable street sweeping service, (R. at 515), fall leaf pickup, (*Id.*), snow and ice removal, (*Id.*), right-of-way mowing, (R. at 515–16), ditch maintenance, (R. at 516), and guard rail maintenance, (*Id.*), to the annexed area.

extend City sewer service within the CTA.

65) If additional sanitary sewer service is needed in the Annexation Territory outside the CTA, the City's Sewer Utility has the capacity to provide such service....

(R. at 517–18.)

The trial court found that the City had made additional commitments beyond the services specifically listed in Section 13(d)(4) and (5), such as:

28) The City plans to provide full advanced life support ambulance service immediately upon annexation to the Annexation Territory through the City's agreement with the Three Rivers Ambulance Authority as well as extra emergency assistance through the City's fire department.

29) ... Solid Waste Manager for the City, testified that this service is one hundred percent (100%) funded by users fees, and [the City] will provide the Annexation Territory with the same service as the Comparable Area....

. . . .

33) Upon the effective date of annexation, the City's Animal Care and Control Department will add two (2) animal control officers and one (1) animal care specialist as well as two (2) vehicles for the new animal control officers to serve the Annexation Territory.

. . . .

39) The City's Parks and Recreation Department operates a street tree program within the corporate boundaries of the City, including the Comparable Area. Upon annexation, residents of the Annexation Territory will be permitted to participate in the Park Department's street tree program under the same procedures by which residents of the Comparable Area participate.

. . . .

42) The city plans to provide to the Annexation Territory upon annexation engineering services for traffic control which would include investigation of the need for, and the installation and maintenance of, traffic control devices, which level of service is standard for the City....

(R. at 512–15.)

These detailed findings of fact demonstrate that the Plan was legally sufficient to fulfill the third purpose of fiscal plans, which is protecting the annexed landowners' future rights to enforce service promises. The City has made enforceable commitments to provide all major City services to the annexed area on an equivalent basis. That is what Section 13(d)(4) and (5) require.

■ *D. The Basis of Comparison.* The trial court concluded that the Plan failed, in part, because:

All of these [Section 13(d)(4)-(5) ] services must be provided in the same manner as they are and will be provided to the Comparable Area. No one used the Comparable Area in determining the services.... The Court concludes that the City is not homogeneous in nature in noncapital and capital improvement services, and City-wide services cannot be used.

(R. at 531–32.) This assumes that a municipality must identify a particular "comparable area" when it annexes new territory and irrevocably commit to providing the two areas with identical services.

The Statute's requirements are not this rigid. In *Chidester I,* we said:

The qualification in [Section 13](d)(4) and (5), that services be equivalent to those in the city with "similar topography, patterns of land use, and population density", provides a guidepost for cities

in determining what services should be provided to the annexed territory. It would be unreasonable to require the city to provide services to the annexed territory that are not needed because of differences in topography, patterns of land use, and population density. For example, storm drains may be provided in neighborhoods which are very flat and have no natural drainage; such drains are not often provided in areas where the topography provides natural drainage. The idea is to provide like services to like areas.

596 N.E.2d at 1378.

In *Chidester II*, 631 N.E.2d 908, we examined a few important services to test the fiscal plan against the Section 13 equivalency requirements. We take the same approach here.

▪ One of the most important services any municipality provides is police protection. The trial court found that "call for service" volume drives the City's police staffing, and that the City estimated annexation area police staffing based on the City's average service call volume. (R. at 519.)

Call volume is a reasonable basis for projecting law enforcement needs, and its application in the Plan will allow the annexed citizens to enforce their right to equivalent services. After annexation, the City may certainly allocate greater police resources to areas that have especially high crime rates. If, however, citizens in the annexed area receive a lower quality of service than citizens in similarly populated areas that have comparable call volumes, the annexed citizens have a basis for demanding more equitable treatment. The City's approach therefore adequately assures like services to similar areas, which, as we stated in *Chidester I,* is the trial court's proper focus.

▪ Fire protection is also a major component of municipal service. The court here found that the three new fire stations promised to the annexed area would offer response times within the same four- to seven-and-a-half-minute range as average response times in a defined Comparable Area. (R. at 510–11.) Again, this promise is sufficiently specific to allow annexed landowners to enforce their future rights.

▪ We next turn to a capital service, i.e. sewer facilities. The trial court found that the City is already providing sewer service to those annexed citizens it is currently authorized to serve, that other parts of the area are already served by a private utility holding a license from the Indiana Utility Regulatory Commission, and that "[i]f additional sanitary sewer service is needed in the Annexation Territory outside the [private utility's area], the City's Sewer Utility has the capacity to provide such service." (R. at 518.) Annexed citizens using City service will pay the same rates as other charged customers. (*Id.*) These findings demonstrate that the Fiscal Plan is adequate with respect to sewers.

▪ In summary, courts reviewing annexation challenges should focus on whether the municipality made credible and enforceable commitments to provide equivalent services to similar areas. Courts are not authorized to dissect the minutiae of what are essentially legislative decisions. Based on the court's factual findings, the Fiscal Plan suffices.

▪ *E. No Entitlement to a Park.* The trial court found:

40) The services to be provided by the City's Parks and Recreation Department to the Annexation Territory are not equivalent in standard and scope to the services provided to the Comparable Area because the Comparable Area has

an accessible neighborhood park and there will be no such accessible neighborhood park for the Annexation Territory. The City looks geographically for new parks. Parks are not located based on population density.

(R. at 514.) The City's final argument is that the statute does not require it to provide a neighborhood park to the annexed area. (Appellant's Br. at 25.)

As the City points out, a neighborhood park is a capital improvement and falls under Section 13(d)(5). The trial court therefore erred in applying the "equivalent in standard and scope" requirement that appears only in Section 13(d)(4), which covers planned non-capital services. Capital improvement services must be provided "in the same manner" that such services are provided to areas with similar topography, land use patterns, and population density. Ind.Code § 36–4–3–13(d)(5). The trial court found that the City chooses its park locations based on geographic considerations. Therefore, providing park services in the same manner does not require the City to create a neighborhood park in the annexed area.

*Summary.* Based on the trial court's findings of fact, the City met its burden under Section 13(d) and was entitled to judgment. The trial court therefore erred by entering judgment for the Remonstrators.

### Conclusion

We reverse and direct judgment for the City.

DICKSON, SULLIVAN, BOEHM, and RUCKER, JJ., concur.