

**FILED**

Apr 05 2018, 9:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR
APPELLANTS/CROSS-APPELLEES

Thomas F. Bedsole
Maggie L. Smith
Frost Brown Todd LLC
Indianapolis, Indiana

ATTORNEY FOR
APPELLEES/CROSS-
APPELLANTS

Gregory W. Black
Gregory W. Black, P.C.
Plainfield, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Town of Brownsburg, Indiana, Town Council of Brownsburg, Indiana, and Jeanette M. Brickler, | April 5, 2018 |
| *Appellants/Cross-Appellees*, | Court of Appeals Case No. 32A01-1702-PL-215 |
| v. | Appeal from the Hendricks Superior Court |
| | The Honorable Heather Welch, Special Judge |
| Fight Against Brownsburg Annexation, et al., | Trial Court Cause No. 32D02-1310-PL-109 |
| *Appellees/Cross-Appellants*. | |

**Brown, Judge.**

The Town of Brownsburg, Indiana, Town Council of Brownsburg, Indiana, and Jeanette M. Brickler (collectively "Brownsburg") appeal the trial court's entry of judgment against them and in favor of Fight Against Brownsburg Annexation ("FABA"), which finds that Brownsburg did not meet its burden under Indiana's annexation statute and that, accordingly, the annexation may not proceed. We revise and restate the issue as whether the trial court's findings and judgment that Brownsburg did not satisfy its requirements are clearly erroneous. We affirm.

### Facts and Procedural History

On July 11, 2013, Brownsburg adopted Ordinance No. 2013-06 (the "Annexation Ordinance") to annex approximately 4,462 acres (the "Annexation Area") outside of Brownsburg's corporate boundaries. On October 7, 2013, FABA, a political action committee created to oppose the annexation, filed a Remonstrance and Petition for Declaratory Judgment and Damages. On November 12, 2015, Brownsburg filed a Motion to Dismiss the Petition for Declaratory Judgment and Damages and Brief in Support of the Motion to Dismiss. On December 14, 2015, FABA filed a Brief in Opposition to Brownsburg's Motion to Dismiss, and on May 31, 2016, the court held a hearing on the motion.

On June 1, 2016, Brownsburg filed a Motion for Partial Summary Judgment, Designation of Evidence in Support of Partial Summary Judgment, and a supporting Brief. On June 28, 2016, FABA filed in response a Brief in Opposition to Brownsburg's Motion for Partial Summary Judgment and a

Designation of Evidence. On July 7, 2016, Brownsburg filed a Motion to Strike Certain Evidence Designated in Opposition to Motion for Partial Summary Judgment and a supporting memorandum of law, to which FABA responded on July 12, 2016.

[4] On July 11, 2016, the court granted Brownsburg's motion to dismiss the petition for declaratory judgment, finding that "FABA's claims will be addressed and fully adjudicated in the remonstration proceedings" and that "there are no set of facts under which FABA could be granted relief under a declaratory judgment." Appellee's Appendix Volume 2 at 27-28. On August 11, 2016, the court issued an order granting in part and denying in part Brownsburg's motion to strike evidence designated in opposition to the motion for partial summary judgment and also granting in part and denying in part its motion for partial summary judgment. The court granted summary judgment "on the issue of whether [Brownsburg] is the 'Provider Unit' for providing the fire protection services for the Annexation Area." Appellants' Appendix Volume 5 at 179.

[5] On August 16, 17, and 18, 2016, the court held a bench trial and on November 16, 2016 entered its "Findings of Fact, Conclusions of Law, and Order on [FABA's] Petition for Remonstrance". *Id.* at 237. On December 13, 2016, Brownsburg filed a motion to correct error and, on January 24, 2017, the court granted the motion and entered its "Amended Findings of Fact, Conclusions of Law and Order on [FABA's] Petition for Remonstrance," finding in favor of FABA and against Brownsburg. Appellants' Appendix Volume 2 at 31. The

court found that Brownsburg had not met its burden under §§ 36-4-3-13(b) or (c), and that the annexation may not proceed.

*Discussion*

[6] When, as here, the trial court enters findings of fact and conclusions, our standard of review is well-settled:

> We may not set aside the findings or judgment unless they are clearly erroneous. In our review, we first consider whether the evidence supports the factual findings. Second, we consider whether the findings support the judgment. Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference. A judgment is clearly erroneous if it relies on an incorrect legal standard. We give due regard to the trial court's ability to assess the credibility of the witnesses. While we defer substantially to findings of fact, we do not defer to conclusions of law. We do not reweigh the evidence; rather we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment.

*State v. IBM*, 51 N.E.3d 150, 158 (Ind. 2016) (internal quotations and citations omitted). In order to determine that a finding or conclusion is clearly erroneous, an appellate court's review of the evidence must leave it with the firm conviction that a mistake has been made. *Town of Fortville v. Certain Fortville Annexation Territory Landowners*, 51 N.E.3d 1195, 1198 (Ind. 2016) (quoting *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997)).

[7] Annexation is subject to judicial review only so far as the General Assembly has authorized it by statute, and the larger object of the annexation statute is, as it has always been, to permit annexation of adjacent urban territory. *City of*

*Carmel v. Certain Sw. Clay Tp. Annexation Territory Landowners*, 868 N.E.2d 793, 797 (Ind. 2007) (quotation omitted). Annexation "is essentially a legislative function." *City of Fort Wayne v. Certain Sw. Annexation Area Landowners*, 764 N.E.2d 221, 224 (Ind. 2002). Therefore, courts play only a limited role in annexations and must afford the municipality's legislative judgment substantial deference. *Id.*

[8] However, as the Indiana Supreme Court has reminded us recently, that

> does not mean a trial court's role is to sustain blindly an annexation decision simply because it is the product of legislative decision-making. Rather, the court is obligated to ensure the annexing municipality has "not exceeded its authority and that the statutory conditions for annexation have been satisfied." *Chidester* [*v. City of Hobart*, 631 N.E.2d 908, 910 (Ind. 1994)]; *accord Bradley v. City of New Castle*, 764 N.E.2d 212, 216 (Ind. 2002) ("The trial court's role is to decide whether the municipality has operated within its authority and satisfied the statutory conditions for annexation."); *City of Aurora* [*v. Bryant*, 165 N.E.2d 141, 145 (Ind. 1960)] ("The court is . . . simply given the power to determine, in the event there is a remonstrance filed, whether certain conditions imposed by the statute are met.").

*Town of Fortville*, 51 N.E.3d at 1198.[1]

---

[1] To the extent that Brownsburg cites the Indiana Supreme Court's guidance in *Fort Wayne*, we observe that the remonstrators' challenge involved Ind. Code § 36-4-3-13(d) (1996), which outlines the various plans, cost estimates, services, and methods of financing necessary for a sufficient written fiscal plan under the annexation statute and which, as the Court held in that case, "does not require more than credible calculation of present costs of individual services adjusted forward to account for inflation." 764 N.E.2d at 226. Though we observe that the Court directed trial courts in *Fort Wayne* not to "'audit' a challenged fiscal plan," *id.* at 224, we observe that, in this case, we do not address the sufficiency of a fiscal plan and, in any event, when it

Ind. Code § 36-4-3-13 lists the prerequisites for annexation, and the municipality bears the burden of showing that it has complied with these statutory conditions. *City of Carmel*, 868 N.E.2d at 797-798. If the municipality meets the requirements of either Subsections 13(b)[2] or 13(c)[3], and also Subsection 13(d)[4], the court must order the annexation to proceed unless the remonstrators establish that all of the conditions set forth in clauses Subsection 13(e)(2)(A) through (D) exist in the territory proposed to be annexed.[5]

comes to all sections of Ind. Code § 36-4-3-13, the Court's most recent guidance on the annexation statute was in *Fortville*, which instructed that the "judgment of the court simply establishes the fact that the conditions of the statute necessary to overcome a remonstrance have or have not been met . . . ." 51 N.E.3d at 1198 (quoting *Chidester*, 631 N.E.2d at 910).

[2] Ind. Code § 36-4-3-13(b) provides in part that the evidence must establish that the "territory sought to be annexed is contiguous to the municipality," and that "[s]ixty percent (60%) of the territory is subdivided."

[3] Ind. Code § 36-4-3-13(c) provides in part that "the territory sought to be annexed is needed and can be used by the municipality for its development in the reasonably near future."

[4] As noted, Ind. Code § 36-4-3-13(d) provides that the municipality seeking annexation develop and adopt a sufficient written fiscal plan that shows various plans, cost estimates, services, and methods of financing.

[5] The subsection provides that the court shall order the proposed annexation not to take place if it finds that the following conditions exist:

    (A) The following services are adequately furnished by a provider other than the municipality seeking the annexation:

        (i) Police and fire protection.

        (ii) Street and road maintenance.

    (B) The annexation will have a significant financial impact on the residents or owners of land.

    (C) The annexation is not in the best interests of the owners of land in the territory proposed to be annexed as set forth in subsection (f).

    (D) One (1) of the following opposes the annexation:

        (i) At least sixty-five percent (65%) of the owners of land in the territory proposed to be annexed.

        (ii) The owners of more than seventy-five percent (75%) in assessed valuation of the land in the territory proposed to be annexed.

Ind. Code § 36-4-3-13(e)(2) (2012) (subsequently amended by Pub. L. No. 228-2015 § 19, eff. July 1, 2015).

[10] Because Brownsburg had the initial burden to establish compliance with the requirements of Ind. Code § 36-4-3-13, it is appealing from a negative judgment.

> A judgment entered against a party who bore the burden of proof at trial is a negative judgment. On appeal, we will not reverse a negative judgment unless it is contrary to law. To determine whether a judgment is contrary to law, we consider the evidence in the light most favorable to the appellee, together with all the reasonable inferences to be drawn therefrom. A party appealing from a negative judgment must show that the evidence points unerringly to a conclusion different than that reached by the trial court.

*Town of Cedar Lake v. Certain Cedar Lake 2014 Annexation Territory Landowners*, 85 N.E.3d 643, 655 (Ind. Ct. App. 2017) (internal quotations and citations omitted), *trans. denied*.

[11] Brownsburg argues that it has met the requirements of Subsections 13(b) through (d) and that the proposed annexation should be allowed to proceed since FABA cannot establish the requirements of Subsection 13(e). Specifically, Brownsburg contends that the trial court erred in holding that Brownsburg failed to satisfy Subsection 13(b)(2)(B)'s subdivision requirement and in concluding that its evidence failed to establish Subsection 13(c) requirements that the Annexation Area is "needed and can be used . . . in the reasonably near future."

[12] FABA contends that the trial court did not err as a matter of law in concluding that Brownsburg failed to prove the subdivision requirements and that the court did not err in finding that Brownsburg failed to prove that the Annexation Area

was needed and could be used for its development in the reasonably near future. Specifically, it argues that the trial court properly applied the plain meaning of the word "subdivided" to the facts of the case because the term is left undefined in the annexation statute and that Brownsburg does not "need" the vast Annexation Area and instead "wants" it for the additional tax revenue because the town has not run out of room and a large amount of "undeveloped/underdeveloped land" exists within its current boundaries. Appellee's Brief at 30.

[13] To the extent that Brownsburg's arguments challenge the court's findings other than those regarding the requirements of Subsections 13(b) through (d) and that FABA raises arguments on cross-appeal, we need not address them.[6] Rather, we find an analysis of Subsections 13(b) and (c) to be dispositive.

A. *Subsection 13(b): Sixty Percent Subdivided*

---

[6] FABA also argues that Brownsburg improperly included the earlier annexed East Annexation area in its corporate boundaries for purposes of determining contiguity in violation of Ind. Code § 36-4-3-3. On cross-appeal, FABA argues that the trial court erred in determining that Brownsburg's fiscal plan met the five mandatory requirements of Subsection 13(d), in granting partial summary judgment to Brownsburg and finding that it provides fire protection to the Annexation Area, and in dismissing FABA's declaratory judgment complaint by holding that no set of facts existed under which FABA could win.

Brownsburg asserts that the trial court should not have declined to make any legal conclusion as to contiguity based upon its finding that Brownsburg failed to meet the other Subsection 13(b) and (c) requirements. In response to FABA's cross-appeal claims, Brownsburg contends that it presented expert testimony as to all five statutory factors of the fiscal plan that went unrebutted by any expert or otherwise qualified testimony; that the trial court correctly granted partial summary judgment on the issue of furnishing fire protection service because the evidence undisputedly shows Brownsburg as the one unit designated as the provider unit for the Annexation Area and as ultimately responsible for providing fire protection services; and that the trial court properly dismissed FABA's separate request for declaratory judgment because FABA did not allege plausible claims of fraud, discrimination, or impairment of their substantial rights that rose to the level of a due process violation and are unable to be addressed as part of the remonstrance process.

[14] We begin by addressing Brownsburg's argument that it satisfied its subdivided requirement. Brownsburg argues that its expert, using six different methods, produced twelve different "percentage calculations" of the relative division of the land in the Annexation Area, nine of which demonstrated a sixty percent or more subdivided Annexation Area. Appellants' Amended Brief at 38. In insisting that the subdivision determination can be based on parcels or tracts, Brownsburg argues that nothing in Indiana law requires that only "actual acreage" be considered, refers to the Indiana Supreme Court's interpretation of "subdivided" in *Rogers v. Municipal City of Elkhart*, 688 N.E.2d 1238, 1241 (Ind. 1997), likens the case here to this Court's recent decision in *American Cold Storage NA v. City of Boonville*, 42 N.E.3d 1027 (Ind. Ct. App. 2015), *trans. denied*, and points to the Hendricks County and Brownsburg Subdivision Control Ordinances to claim that both ordinances expressly reference "parcels," and not acreage, when defining subdivision. Appellants' Amended Brief at 40-41.

[15] At trial, Brownsburg stipulated that it was pursuing only the second prong under Ind. Code § 36-4-3-13(b)(2), or that "[s]ixty percent (60%) of the territory is subdivided." Ind. Code § 36-4-3-13(b)(2)(B) (2012) (subsequently amended by Pub. L. No. 228-2015 § 19, eff. July 1, 2015). Both Brownsburg and FABA presented evidence with respect to the extent that the Annexation Area is subdivided.

[16] Brownsburg Senior Planner, Jonathan Blake, testified that he was asked by the council and town manager to make a determination on the percentage of the Annexation Area that was subdivided and that he developed six different

scenarios when looking at the term subdivided to analyze the Annexation Area. His first method of analysis considered only traditional subdivision plats which were formally recorded – *i.e.* where a document was recorded with the county recorder and auditor's office for purposes of creating new parcels or tracts – and associated rights-of-way[7] and resulted in a scenario where 957 tracts (66.74%) and 780 acres (17.5%) of the Annexation Area would be considered subdivided. His second method considered all recorded subdivision plats, associated rights-of-way, and metes and bounds[8] legal descriptions of properties within the Annexation Area, except quarter-quarter sections,[9] and resulted in a scenario where 1,326 tracts (92.5%) and 3,440 acres (77.1%) of the Annexation Area would be considered subdivided. When asked why his second method included metes and bounds legal descriptions, Blake testified that historically and presently property in different parts of the state was and is transferred using the metes and bounds legal description, which usually begins at a section corner or

---

[7] A right-of-way is defined as "1. The right to pass through property owned by another. A right-of-way may be established by contract, by longstanding usage, or by public authority (as with a highway). *Cf.* EASEMENT. 2. The right to build and operate a railway line or a highway on land belonging to another, or the land so used. . . . 4. The strip of land subject to a nonowner's right to pass through." BLACK'S LAW DICTIONARY 1522 (10th ed. 2014).

[8] Metes and bounds are defined as "[t]he territorial limits of real property as measured by distances and angles from designated landmarks and in relation to adjoining properties. Metes and bounds are usu. described in deeds and surveys to establish the boundary lines of land." BLACK'S LAW DICTIONARY 1141 (10th ed. 2014).

[9] As described at trial, a quarter-quarter section is "approximately 40 acres in size," and is generally one of the smallest pieces of ground that were described in the public land survey system established in the 1700s or 1800s by the federal government. Transcript Volume 1 at 40. Blake testified that when "we were looking at – uh – annexation territory and looking at the term subdivided we recognized that potentially – you know – 40 acres tracts that had not been – uh split into smaller – uh – parcels or tracts – uh – could still considered unsub[divided]." *Id.* at 41. The court was shown an example of a quarter-quarter section during Blake's direct examination. *See id.*

a quarter-quarter corner and then "starts tracing out property if you follow the calls within the description." Transcript Volume 1 at 40.

[17] Blake's third method considered all recorded subdivision plats, associated rights-of-way, and metes and bounds legal descriptions of properties within the Annexation Area, except those describing the parent tracts[10] remaining after a portion of the property is divided off, and resulted in a scenario where 1,322 tracts (92.2%) and 1,669 acres (37.4%) of the Annexation Area would be considered subdivided. His fourth method considered all recorded subdivision plats, associated rights-of-way, and metes and bounds legal descriptions of properties within the Annexation Area, except those creating less than three portions from a quarter-quarter section, and resulted in a finding that 1,327 tracts (92.5%) and 3,198 acres (71.7%) of the Annexation Area would be considered subdivided.

[18] Blake's fifth method considered all recorded subdivision plats, associated rights-of-way, and metes and bounds legal descriptions of properties within the Annexation Area broken into two or more lots or other divisions of land, and resulted in a scenario where 1,350 tracts (94.1%) and 3,804 acres (85.3%) of the Annexation Area would be considered subdivided. His sixth method considered all recorded subdivision plats, associated rights-of-way that went

---

[10] When asked to explain the term "parent tract" at trial, Blake described the following scenario: "If you have a 40 acre field and I split off 2 acres for a house the remaining 38 acres would be what's considered the parent tract because it is what the smaller piece of property came from." Transcript Volume 1 at 42.

along the subdivisions and where the annexation bordered a county road right-of-way taking in both sides, and metes and bounds legal descriptions of properties within the Annexation Area broken into two or more lots or other divisions of land, but excluding any tract of land larger than twenty acres, and resulted in a scenario where 1,296 tracts (90.3%) and 1,810 acres (40.5%) of the Annexation Area would be considered subdivided. When asked why his sixth method excluded all tracts greater than twenty acres, Blake testified that Hendricks County's zoning subdivision controller provided at the time of the annexation an exemption for subdivision of land greater than twenty acres. *Id.* at 48.

[19] The court also admitted Petitioner's Exhibit 8, an April 2014 Municipal Survey by the Indiana Advisory Commission on Intergovernmental Relations that states that "the approximate percentage of each type of land use within the annexation area prior to annexation" was "Agricultural 76.88%, Commercial .02%, Industrial 0%, Residential 21.50%, Municipally-owned property 0%, [and] Institutional 1.60%." Exhibits Volume 3 at 188. During his cross-examination, Blake was shown Petitioner's Exhibit 8 and, when asked "in the event [that the Annexation Area] is like 76.88% agricultural how can it be subdivided to a degree greater than 60%? How does that make any sense," he answered that "we didn't include[] – or we didn't review just one turn or one scenario under which you could determine the property be subdivided." Transcript Volume 1 at 70.

[20] FABA's witness and Hendricks County cartographer, Lewis Dee Kirts, also calculated the number of subdivisions within the Annexation Area. During his testimony, Kirts was handed Petitioner's Exhibit 9(A), which the court admitted, and testified that he recorded the actual acreage from records at the courthouse or government annex, that his work product showed that the Annexation Area is 17.54 percent subdivided, that he was generally familiar with what Hendricks County considered to be a subdivision, and that Petitioner's Exhibit 9(A) comported with his understanding with how Hendricks County treats the definition of a subdivision.

[21] In its findings, the court noted that examining a map of the Annexation Area demonstrates that the Area is "predominantly agriculture." Appellants' Appendix Volume 2 at 33. The order's "conclusions of law" section, after acknowledging that the annexation statute contains no definition of the term "subdivided,"[11] considered the plain and ordinary meaning of the word "subdivide" and noted that Brownsburg could meet the requirement if the "area of the subdivisions currently within the Annexation Area is sixty percent of the

---

[11] The court attached a footnote after this observation, noting:

> it would be helpful for the Court's judicial review for determining a municipality's compliance with the Annexation statute if "subdivision" and "reasonably near future" were defined. This would not only make application of a municipality's ordinance to the statute more precise and clear-cut, it would also promote uniformity in judicial decisions, and would assist counsel in knowing the exact criteria necessary to indicate that the Annexation Area is sixty percent subdivided, rather than having to explore academic exercises of ways to demonstrate that the Annexation Area is sixty percent subdivided.

Appellants' Appendix Volume 2 at 50.

Annexation Area." *Id.* at 50. The order took notice of the list of recorded subdivisions within the Annexation Area provided by Kirts, which detailed the minor plats as well as the subdivisions by name, and states that the "list demonstrates that the actual acreage of the thirty-six subdivisions and nineteen minor plats constitutes 17.54 % of the Annexation Area," which is "well below the sixty percent required by Indiana Code § 36-4-3-13(b)." *Id.* at 50-51. The order then considered the Indiana Supreme Court's guidance and review of the legislative history of Indiana's annexation statutes:

> The earliest annexation statute was adopted in 1824. . . . It provided practically automatic annexation of improved land whenever any adjacent out-lot was platted into new-building lots and then recorded. The acts of building and recording building lots were viewed as constructive consent to annexation. In this century, the law permitted annexation of subdivided land "whether platted or not." By 1935, the reference to platting was removed altogether. In 1955, the legislature chose to use the phrase "The area is urban in character, being an economic and social part of the annexing city." The current method[s] of proving urban character were adopted in 1969: (1) 60% subdivided, (2) 3 persons per acre, or (3) zoned for commercial, business, or industrial uses.

*Id.* at 51 (quoting *Rogers*, 688 N.E.2d at 1241 n.5). It also states that the legislative history indicates "a requirement that annexation of *improved* land take place," *id.* (emphasis added by trial court), and that "all of these descriptors indicate a requirement that the land to be annexed be improved or developed." *Id.* It concludes that "with 76.88% of the Annexation Area being agricultural, this Court finds that [Brownsburg] cannot meet this requirement," *id.* (citing

Exhibits Volume 3 at 188), and cites for support this Court's statement that "[e]ven with statutory amendments over time, 'the object of annexation has remained the same: "to permit annexation of adjacent urban territory."'" *Id.* (citing *Town of Whitestown v. Rural Perry Township Landowners*, 40 N.E.3d 916, 911 (Ind. Ct. App. 2015) (quoting *City of Carmel*, 868 N.E.2d at 796 (quoting *Rogers*, 688 N.E.2d at 1242)), *trans. denied*).

[22]  Next, the order considered that a municipality's definition of subdivision is "another possible 'yardstick' a court may employ to determine whether the territory meets the subdivision requirement" and quotes Brownsburg's Subdivision Control Ordinance, which defines "subdivision" and provides in part:

> Any land, vacant or improved, which is divided or proposed to be divided into two (2) or more lots, parcels, sites, units, plots, or interests for the purpose of offer, sale, lease, or development either on the installment plan or upon any and all other plans, terms, and conditions, including re-subdivision. Subdivision includes the division or development of either residentially or non-residentially zoned land, whether by deed, metes and bounds description, or other recorded instrument. For the purposes of these regulations, the following are exempt as implying subdivision, and thereby exempted from the platting requirements of this chapter:
>
> *(1) A division of land into two (2) or more tracts for an agricultural use.* . . .

(FABA Exhibit 55.) [12]

*Id.* at 52 (citing *Rogers*, 688 N.E.2d at 1242); *id.* at 52-53 (quoting Brownsburg's Subdivision Control Ordinance) (emphasis added by trial court). After describing Brownsburg's six methods, the order states that Blake testified during cross-examination that the agricultural portions of the Annexation Area were included in at least some of the calculations, that there was no indication as to which particular methods included the agricultural portions of the Annexation Area, and that, given the fact that Brownsburg's Subdivision Control Ordinance excludes division of land into two or more tracts for an agricultural use from the definition of subdivision and that 76.88 percent of the Annexation Area was agricultural, ideally only 23.12 percent of the Annexation Area would be available to count toward the sixty percent subdivided requirement.

[23] Next, the order considered the Hendricks County Subdivision Control Ordinance, and states that it does not support a finding that the Annexation Area is sixty percent subdivided, providing in relevant part:

> Subdivision includes the division of development of land opened for residential and nonresidential uses, whether by deed, meets [sic] and bounds description, devise, intestacy, lease, map, plat, or other recoded [sic] instrument. The following kinds of

---

[12] In quoting Brownsburg's Subdivision Control Ordinance, the court cites to "FABA Exhibit 55." Appellants' Appendix Volume 2 at 53. While Exhibit 55 does not seem to be included in the Exhibits Volume, Brownsburg's Subdivision Control Ordinance does appear in the Appellee's Appendix and Brownsburg cites to the Subdivision Control Ordinance in its brief. Transcript Volume 3 at 6; Appellee's Appendix Volume 2 at 169; Appellants' Amended Brief at 41.

division of existing parcels of land are exempted from this ordinance:

> (1) *A tract, which is at least twenty (20) acres in size*;
>
> [ . . . ]
>
> (6) *A division of land to be subdivided for agricultural use only, provided that no additional building sites are created by this division*.

*Id.* at 55 (quoting the Hendricks County Subdivision Control Ordinance) (emphases added by trial court). The order then states that, similar to Brownsburg's Subdivision Control Ordinance, the Hendricks County Subdivision Control Ordinance is consistent with the statutory purpose of limiting annexation to adjacent urban territory as it excludes, among other things, tracts that are at least twenty acres in size and land subdivided for agricultural use only and that the Hendricks County Subdivision Control Ordinance does not support a finding that the Annexation Area is sixty percent subdivided. The order notes that of Blake's six methods, only the second and sixth method remove tracts of at least twenty acres in size, and that the sixth method explicitly states the exemption and the second method exempts quarter-quarter sections, before then finding that Brownsburg is unable to satisfy the sixty percent subdivided requirement for the same reasons as it decided regarding Brownsburg's Subdivision Control Ordinance.

[24] In conclusion, the order states:

> When examining the various methods by which the Court may determine if the Annexation Territory is sixty percent subdivided,

this Court finds that the testimony most credible and accurate is [Kirts's]. His testimony demonstrates that the Annexation Territory is 17.54 % subdivided. After examination of his testimony and after considering the legislative intent or purpose of this annexation statute being "to permit annexation of adjacent urban territory", this Court finds that the Annexation Area is not sixty percent subdivided. Furthermore, when closely examining the Annexation Area, it is clear that the portion of this area to the West of the Town without including the portion of the area to the north and east of the Town may satisfy the sixty percent subdivided requirement but when the Court considers the entire Annexation Area, it simply does not satisfy this requirement for the above stated reasons.

[ ] Furthermore, this Court finds that in order to follow the legislative intent of the annexation statute, this Court should consider the total actual acreage of the Annexation Area including large tracts/parcels and the agricultural land. When doing so, this Court finds the Town has failed to comply with the requirement that the Annexation Area be sixty percent subdivided.

*Id.* at 56-57.

[25] In *Boonville*, this Court decided against fitting the "overly narrow definition" advanced by the remonstrators onto the term subdivided, noting the Indiana Supreme Court's guidance in *Rogers*, 688 N.E.2d at 1242, that the "definition a municipality uses for these purposes is one yardstick a court may employ." 42 N.E.3d at 1033. The remonstrators in *Boonville* argued that "virtually all land in the United States has been divided at some point" and that "[w]ithout evidence regarding the dates on which the parcels were divided, Boonville's expert's definition of 'subdivision' might apply to land divided more than a century ago,

when one farmer sold some land to another." *Id.* This Court held that the trial court properly refused to limit the definition of subdivided to "parcels of land that have actually gone through the process set forth by the county subdivision control ordinance."

[26] Unlike the trial court in *Boonville*, the court here did not overly narrow or limit the definition of "subdivided"; instead, it looked in several directions as it perceived the need for greater definition. *Cf. Rogers*, 688 N.E.2d at 1241-1242 (affirming the trial court's finding that the land was "subdivided" was sufficient based on the record and noting that "[i]nasmuch as the present statute contains no definition of 'subdivided,' the trial court might well have looked in several directions if it perceived the need for greater definition"). After hearing the evidence and finding that the list of thirty-six subdivisions and nineteen minor plats constituted only 17.54 percent of the Annexation Area under the plain and ordinary meaning of subdivided, the court considered other interpretations under the applicable subdivision control ordinances and the six methods that Blake constructed and that Brownsburg presented. It noted that both ordinances excluded from the definition of "subdivided" any divisions of land for agricultural use. It further noted Brownsburg's Subdivision Control Ordinance and found that, using its application as a guide, only 23.12 percent of the Annexation Area would be available to count toward the sixty percent subdivided requirement. The court also applied the Hendricks County Subdivision Control Ordinance, noted that only two of Brownsburg's six methods removed tracts of at least twenty acres in size, and found that the sixty

percent subdivided requirement could not be met under the Hendricks County subdivision control ordinance either. Based upon the record and under these circumstances, we cannot say that the trial court clearly erred in holding that the Annexation Area in question could not meet the sixty percent subdivided requirement.

B. *Subsection 13(c): "[N]eeded and can be used . . . in the reasonably near future"*

Brownsburg argues that it identified multiple advantages to annexation that benefit the Town's long-term growth plans, including the Ronald Reagan Parkway (the "Parkway"), the Interstate 74 Crossing, water and sewer services, increased residential, commercial, and industrial development, and anticipated future growth connected to schools. In support of its argument, Brownsburg likens the situation here to *Whitestown*, 40 N.E.3d at 927, and *Boonville*, 42 N.E.3d at 1035. It contends that, over the next five to fifteen years, the Parkway will be extended past its current end-point inside Brownsburg's limits and the only way to prevent the negative impact on traffic flow, land use, property values, and future costs is to annex the area now. It also contends that the need for the anticipated development and construction of a bridge crossing of Interstate 74 was undisputed based on the current traffic congestion where it intersects State Road 267, the crossing is in the planning stages and not scheduled for installation for nine years, and Brownsburg deems it critical to presently annex the land now so it can be a part of the planning process. Further, it argues that it provides water, sewer, and wastewater services to a significant number of properties in the Annexation Area and that annexation

would allow those residents to receive the services on the same basis as those services are provided to current residents of Brownsburg; that it needs and intends to increase residential, commercial, and industrial development within the Annexation Area; and that the Brownsburg School Corporation has no present plans to develop future schools right now because it is currently "in 'limbo' financially" and the expansion of the Parkway through the Annexation Area is expected to increase the financial resources of the School Corporation for possible expansion at that time. Appellants' Amended Brief at 47. In its reply brief, Brownsburg also contends that the trial court's conclusions involving the Parkway, Interstate 74, and school district are not the bulk of the evidence presented at trial.

[28] At trial, Blake testified that he was told that the annexation was taking place for future planning purposes for the Parkway, road improvements on the west side, and future land use planning such as residential and commercial along the Parkway, that no one specific land use was discussed, and that the east annexation was completed at that point.

[29] Todd Barker, the Director of Development Services, Building and Planning for Brownsburg, testified about Brownsburg's Comprehensive Plan, which had been submitted into evidence and was created to develop a vision and goal for the community with a "20 to 30 year . . . kind of reach forward into the future," and the transportation, land use, and growth plans contained therein. Transcript Volume 1 at 75. He testified that he was familiar with Brownsburg's previous eastern annexation which took place in 2011 and, when asked about

the acreage of that annexation, that he believed 2,100 acres sounded correct. He testified that water and waste services are not provided to the entire Annexation Area, that there are portions of the north section of the Annexation Area where people are not on water and sewage, and that there is not a construction timeline at this point for the expected development of the Parkway north of 56th Street and he was not aware of any funding requests or similar statements that have been put out with respect to it. He also testified that Brownsburg submitted a request into the "Indianapolis MPO's long range transportation plan" that would include planning for the crossing of Interstate 74 as part of the planned development process and that the project was targeted for essentially 2026. *Id.* at 92.

[30] When asked if, from a planning standpoint, it was preferential to have the schools first and the Parkway second, Barker testified that "between the roadway and schools . . . I don't know that I would have a preference," that ideally "if the schools get developed before the road there's likely other road improvements" that would need to be provided, and that "from a town's standpoint we'd probably rather do one type of improvement than multiple layers of improvement." *Id.* at 89-90. During cross-examination, when asked if he mentioned that the Parkway area is attractive because of the higher assessed value, Barker responded "essentially in terms of controlling – uh – managing the – the growth that happens along there, yes." *Id.* at 113. He also testified that Hendricks County has been the lead on the Parkway project.

[31] Former Brownsburg Town Council member, David Richardson, testified that he served four years on the town council starting in January 2011, that he was directly involved with the north annexation starting in December 2012, and that within the Annexation Area, some areas were "rural with a small R," some areas were "rural with a capital R," and some areas were "so deeply rural that if they ever see commercial development it won't be in [his] lifetime." *Id.* at 239. When asked if in his opinion Brownsburg needed the area for its use, he answered in part that:

> the future of Brownsburg that – one of the reasons why I moved to Brownsburg. I saw as an individual – um – figuratively speaking on [the] eastern horizon this dust cloud called progress coming right at us. And if we did not get out in front of it it would overrun us. And so, progress if it's inevitable, needs to be managed. So, did we need the annexed area, no. On the other hand, if we didn't manage that progress we – we as a community would – would – would be in trouble.

*Id.* at 240-241. When asked what the plan was for the Annexation Area, he testified that he did not believe Brownsburg had one specific plan for the entire Annexation Area, but that they knew if "you have an interstate an interchange clearly something's gonna happen there." *Id.* at 241. He also testified that, with regard to the size of the annexation, he thought that the council of Brownsburg was "biting off more than [it] could chew." Transcript Volume 2 at 2. He stated that he had doubts they "could in fact provide all those services for 12 million dollars," and there were a "lot of roads" and a "lot of

subdivisions and . . . a lot of corn fields and that's a lot of pipe." *Id.* at 23.

Richardson also testified two days later that:

> at least initially I was somewhat awestruck by the magnitude of [the Annexation Area]. But after that went away, I started asking questions and asking you know this is going to be approximately fifty to sixty percent of a land based increase for us, the town and I began to ask questions like, how the heck are our cops going to cover – with what we have, how are they going to cover that? Um, how are we going to provide all the other services that by law we're required to provide? There was much discussion and internal debate and so on and so forth.

*Id.* at 174.

[32] John Ayers, a Hendricks County engineer, testified that the small portion of the existing Parkway built up to County Road 600 North or 56th Street is already inside Brownsburg, that any development along the Parkway is to be governed by existing law wherever it is located, that it was fair to say that the connection the Parkway is to serve between Interstates 65 and 70 to the south as it runs along the airport area is going to proceed regardless of any annexation and "the county intends to . . . continue construction of the [Parkway] with or without involvement" of Brownsburg. *Id.* at 120. He also observed:

> The part that's under construction now, the majority of that I believe is in the town of Brownsburg. But the – the history of the parkway as we've constructed it has always been the county has pushed it and initiated it. Brownsburg is participating in funding the construction that we're under construction with right now to three hundred. Brownsburg is participating in that funding because a lot of – a large portion of it, if not all of it, is in the

town limits. The – we are currently planning the extension from or starting to plan the extension from 600 North up into Boone County at I-65. Currently none of that is in Brownsburg town limits. We're doing it with a (indiscernible) agreement with Boone County. So, currently the participants in that agreement are Hendricks County and Boone County and we are advancing the project that way. If portions of it become annexed in the future, we anticipate we would hope there would be participation from the towns there. I say towns because there's also two towns in Boone County that are involved, Zionsville and Whitestown.

*Id.* at 119-120.

[33] Brownsburg Superintendent Jim Snapp testified that the School Corporation has one hundred and eleven acres in the Annexation Area and there are "absolutely no plans whatsoever" for the area. *Id.* at 72. Don Stanley Gunning, a remonstrator, testified that twice in approximately the last eight years, housing development companies have come and wanted to "develop ninety-four acres and put [in] two hundred and fifty, two hundred and seventy four homes," that it went before the Brownsburg zoning commission, that residents said "you can't support that because of the drainage alone," that the county surveyor came in a couple of times and testified that it was true, and that the town council said that it could not support having the homes out there. Transcript Volume 3 at 86. Jack Halsey, a resident residing within the Annexation Area, testified that, considering the size of the annexation, he questions if Brownsburg would take care of him if he was annexed, and stated that:

[At] one of the hearings with the town board, we talked to a couple of the town board members and I don't recall which one gave me this answer. I said, if you're going to increase the size of the town by a major percentage, how do you intend to take care of the snow removal because they do a decent job because it's going to take more people and more trucks and you can't do that immediately. The comment I got was, well the county will have extra trucks and personnel. We intend to – possibility would be to contract with the county to have them do the job. So the town would be contracting with the county to do the work they already do.

*Id.* at 168-169. He also testified that he pays a "very minimal amount to the county for maintenance of the drainage system around there." *Id.* at 169.

[34] The order's Subsection 13(c) analysis notes that, like "subdivided," "reasonably near future" is not defined by the statute, and turns for guidance to this Court's decision in *Abell v. City of Seymour*, 275 N.E.2d 547, 548 (Ind. Ct. App. 1971). It states that a time frame of a "few years (i[.]e. 3 to 5)" would meet the reasonably near future requirement. Appellants' Appendix Volume 2 at 57-58. The order notes Brownsburg's contentions that the Annexation Area is needed and can be used for the extension of the Parkway, for future planning purposes, and for road improvements on the Area's western portion, before then discussing each in turn. Next, it states that, "while it is hypothesized that the timing for the extension of the Ronald Reagan Parkway may be within the next five to fifteen years," the timing of construction "is not precisely known," that the current planning for the Parkway did not include Brownsburg, and that Snapp's testimony indicated that the school district has no plans with regard to

development of Brownsburg schools within the Annexation Area. *Id.* at 59. The order further observes that, regarding the capability of the land in the Annexation Area to be used for residential purposes, the Brownsburg Zoning Board disapproved of the two developments going in over the past five to six years and "one of the issues raised was that the soil was not conducive for draining" and that the phrase "improvements on the west side" refers to the bridge project over Interstate 74, which is targeted for 2026 and for which the current time frame of "ten years away – assuming the targeted date is met – . . . does not indicate that the Annexation Area" could be used in the reasonably near future. *Id.* at 60. The order then concludes its analysis of Subsection 13(c) and states:

> When this Court considers the question of whether Brownsburg needs and could use the Annexation Area for a purpose other than increased collection of property taxes in the "reasonably near future" and giving deference to the Town Council's Annexation Ordinance as appropriate legislative action, this Court does not find that the entire Annexation Area is "needed and can be used" because of the following reasons: 1) a substantial majority of the approximately 4,400 acres of land is not needed and used based on the evidence, 2) the Town only anticipates that small portions of the land maybe [sic] used and need[ed] but the evidence indicates that would be at the very least 5 to 15 years in the future. This Court does not find that the Indiana General Assembly intended that predominantly agriculture/rural land be annexed by a municipality without some evidence that the municipality needs and can use the land in the "reasonably near future". The evidence simply does not comply with the requirement that the Annexation Area is needed and can be used in the "reasonably near future".

*Id.* at 61.

[35] To the extent Brownsburg cites *Whitestown* and *Boonville*, we find those cases distinguishable for these purposes. In *Whitestown*, the annexation encompassed an area of 621.87 acres and contained a parcel of land that the municipality had already acquired for the eventual site of its new Waste Water Treatment Plant. 40 N.E.3d at 919. A new water main line was to be run to the Plant along a county road which ran through the northern end of the annexation area, and the construction of the Plant was set to commence and proceed without regard to the result of the challenge to the ordinance. *Id.* In its analysis of the trial court's application of Ind. Code § 36-4-3-13(c), this Court observed that there was "no evidence presented to the trial court that Whitestown's only purpose in pursuing the [a]nnexation [o]rdinance was to bolster its tax base, and no evidence presented by the Remonstrators to counter any number of the other reasons advanced by Whitestown for the annexation." *Id.* at 927.

[36] In *Boonville*, the annexation was needed and could be used in part because, as this Court noted, Boonville had "run out of room" and needed the territory to "be able to grow and attract new business and industry"; Boonville had "zero acres outside of the floodplain that are available for commercial, business, or industrial development" and the annexation territory "would add 227 such acres"; and Boonville had "plans for bringing new development" to the annexation territory, including "sewer services and a major transportation linkage" and had "already constructed a new Sewer Treatment plant" within the annexation territory. 42 N.E.3d at 1036.

[37] Here, Blake testified that the annexation was taking place for future planning purposes involving the Parkway and road improvements on the west side. He testified that it was also taking place for future land use planning, but no one specific land use was discussed. Barker testified that Brownsburg's Comprehensive Plan was developed for a "20 to 30 year" reach forward into the future, that there is no construction timeline for the expected development of the Parkway north of 56th street, and that the planning for the crossing of Interstate 74 was targeted for 2026. Transcript Volume 1 at 75. Further, the record reveals that FABA presented evidence in response to Brownsburg's reasons for its annexation of approximately 4,462 acres. Richardson testified that Brownsburg was "biting off more than [it] could chew," that they did not need the proposed Annexation Area but rather needed to "manage the progress" or "be in trouble," and that commercial development in some areas of the Annexation Area would not be in his lifetime. Transcript Volume 1 at 241; Transcript Volume 2 at 2. Ayers testified that it was fair to say that the connection that the Parkway is to serve will proceed regardless of whether the annexation takes place and that the county intends to continue the construction with or without the involvement of Brownsburg. Additionally, Snapp testified that the school corporation had "absolutely no plans whatsoever" for the area and Gunning testified about the two prior unsuccessful attempts at housing development in the Annexation Area. *Id.* at 72.

[38] The trial court was able to assess and weigh the testimony presented, to find that "small portions of the land maybe [sic] used and need[ed] but the evidence

indicates that would be at the very least 5 to 15 years in the future," and to conclude that Brownsburg did not need or could not use the approximate 4,462 acres within the Annexation Area in the "reasonably near future." Appellants' Appendix Volume 2 at 61. Brownsburg's arguments to the contrary amount to a request that we assess witness credibility and reweigh the evidence, which we decline to do. *See Cedar Lake*, 85 N.E.3d at 655 (holding that the evidence was sufficient to sustain the trial court's conclusion that the town failed to establish that the annexation territory was needed and could be used in the reasonably near future and noting that the town's argument is "nothing more than an invitation for this [C]ourt to reweigh the evidence, which we will not do").

[39] Given the evidence set forth above and in the record, we cannot say that the court's decision in holding that Brownsburg failed to meet the "needed and can be used" requirement of Ind. Code § 36-4-3-13(c) is clearly erroneous. *See Fortville*, 51 N.E.3d at 1198-1202 (noting that the evidence showed that no remonstrators had been approached by developers interested in their land, that no residential building permits had been issued in all of Fortville since 2007 and only seventeen building permits had been issued since 2009, and that Fortville had presented no evidence of impending development on the previously-attained 775 acres it had annexed in 2009, and holding that, because Fortville had failed to meet its burden demonstrating the territory was needed and could be used for development in the near future, the trial court's decision to deny the annexation was not clearly erroneous).

## *Conclusion*

[40]    For the foregoing reasons, the judgment of the trial court that Brownsburg did not meet the requirements for annexation under Ind. Code §§ 36-4-3-13(b) or (c) is affirmed.

[41]    Affirmed.

Najam, J., and Kirsch, J., concur.